UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x

MICHELE TORRES,                          :

              Plaintiff,            :            OPINION & ORDER

       -against-                       :

COMMISSIONER OF SOCIAL SECURITY,               20 Civ. 2612 (GWG)

             Defendant.            :
-------------------------------------------------------------x

**GABRIEL W. GORENSTEIN, United States Magistrate Judge**

Plaintiff Michele Torres brings this action pursuant to 42 U.S.C. §§ 405(g) and 1383(c) to obtain judicial review of the final decision of the Commissioner of Social Security (the "Commissioner") denying her claim for Disability Insurance Benefits ("DIB") under the Social Security Act ("the Act"). Both parties have moved for judgment on the pleadings pursuant to Fed. R. Civ. P. 12(c).[1] For the reasons set forth below, Torres's motion is denied, and the Commissioner's cross-motion is granted.

I. BACKGROUND

    A. Procedural History

On January 4, 2017, Torres "filed a Title II application for a period of disability and disability insurance benefits, alleging disability beginning January 19, 1999." SSA Administrative Record, filed November 23, 2020 (Docket # 15), at 10 ("R."). The record does

---

[1] Plaintiff's Motion for Judgment on the Pleadings, filed January 25, 2021 (Docket # 17); Plaintiff's Memorandum of Law in Support, filed January 25, 2021 (Docket # 17-1) ("Pl. Mem."); Defendant's Cross Motion for Judgment on the Pleadings, filed March 25, 2021 (Docket # 18); Defendant's Memorandum of Law in Support, filed March 25, 2021 (Docket # 19) ("Def. Mem."); Plaintiff's Memorandum of Law in Opposition to Defendant's Cross Motion for Judgment on the Pleadings, filed April 15, 2021 (Docket # 20) ("Pl. Opp.").

not explain why there was an 18-year gap between the disability onset date and Torres's application.  Torres's application was denied on February 14, 2017, see R. 109-114, after which Torres requested a hearing before an administration law judge ("ALJ"), see R. 115-117.  A hearing was held on October 19, 2018.  See R. 35.  The ALJ found that Torres was not disabled from the alleged onset date of January 19, 1999, until her last date insured, which was September 30, 2003, and denied Torres's claims in a written decision on December 14, 2018.  See R. 10, 20. Torres requested a review by the Appeals Council, which was denied on January 29, 2020.  See R. 1-3.  On March 27, 2020, Torres filed this action seeking review of the ALJ's decision.  See Complaint (Docket # 1).

B.  The Hearing Before the ALJ

The hearing was held in New York, New York where Torres and her counsel appeared in person.  See R. 28, 35, 38.  Medical Expert ("ME") Dr. Hugh Savage testified by telephone.  See R. 35, 38.

Torres testified that she was forty-eight years old at the time of the hearing, was not working and had not worked since 1999.  R. 39.  She had a worker's compensation claim which had settled and from which she continues to receive payments.  R. 39-40.  Torres lives in Brooklyn, R. 45, with her mother, R. 43, and brother, R. 47.  She traveled to the hearing by train. R. 43.

Torres obtained her general education diploma, R. 45, and went through a course to obtain a state license to be an emergency medical technician ("EMT").  R. 44-45.  Torres was thereafter employed as an EMT.  R. 44.  Torres injured her back on the job when she and her partner "went to shift [a] patient from the bed over to the stretcher," and "the patient fell on [her] and [she] was pinned in between the wall."  R. 56.  Torres had to be taken to the hospital where

2

she stayed for three days.  Id.  Following her release, Torres engaged in pain management,

physical therapy, and eventually underwent surgery for her back injury.  R. 57.

The surgery stopped the "nerve pain" Torres was feeling, R. 57, but Torres continued to

have "severe muscle spasms throughout [her] back," R. 58.  Even after the surgery, Torres had to

lie down for a "majority of the day," id., and was not able to do "housekeeping duties" or leave

the house, R. 59.  Torres spent an average of "10 to 12 hours" a day lying down.  R. 64.  She also

had trouble concentrating due to the pain and would have to write herself notes to remember

anything important.  R. 64-65.  Torres would have good days and bad days but would try to do

too much during the good days and would be "set back" and need stay in bed afterwards.  R. 66-

67.

Sometime in 2003 or 2004, Torres was diagnosed with fibromyalgia and began seeing a

rheumatologist.  R. 61.

The ALJ asked Dr. Savage whether, "[b]etween 1999 and the end of 2003," there were

any "physical examinations that show that" Torres could not "do sedentary work?"  R. 69.  Dr.

Savage responded he did not "believe so."  Id.  Dr. Savage and the ALJ then went through a

number of the medical examinations in the record, which indicated Torres would have been

experiencing some pain, see R. 70-72, but Dr. Savage testified that he "could not find" that these

indicated there was a year-long period where Torres could not perform sedentary work, R. 72.

C.  The Medical Evidence

Both Torres and the Commissioner have provided detailed summaries of the medical

evidence.  See Pl. Mem. at *6-22; [2] Def. Mem. at 3-11.  The Court had directed the parties to

specify any objections they had to the opposing party's summary of the record, see Scheduling

---

[2]  *__ refers to pages assigned by the ECF system.

Order, filed November 25, 2020 (Docket # 16) ¶ 5, and neither party has done so.  Accordingly, we adopt the parties' summaries of the medical evidence as accurate and complete for purpose of the issues raised in this suit.  We discuss the medical evidence pertinent to the adjudication of this case in Section III below.

    D.  The ALJ's Decision

The ALJ denied Torres's application on December 14, 2018.  See R. 20.  In doing so, the ALJ concluded Torres "was not under a disability within the meaning of the Social Security Act from January 19, 1999, the alleged onset date, through September 30, 2003, the date last insured."  R. 10.

Following the five-step test set forth in the Social Security Administration ("SSA") regulations, the ALJ found that Torres had last met the insured status requirements on September 30, 2003, and "did not engage in substantial gainful activity during the period from the alleged onset date of January 19, 1999, through the date last insured of September 30, 2003."  R. 12.  At step two, the ALJ found Torres "had the following severe impairments: degenerative disease of the lumbar spine, status post lumbar surgery in 2002; obesity; and degenerative disease of the cervical spine beginning in 2002."  Id.

At step three, the ALJ found Torres "did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 [C.F.R.] Part 404, Subpart P, Appendix 1" during the relevant period.  R. 13.  The ALJ specifically considered the listings in 1.00 (musculoskeletal), including 1.04A.  Id.

Before moving to step four, the ALJ assessed Torres's residual functional capacity ("RFC") for the relevant period.  R. 14.  The ALJ determined Torres had the RFC "to perform the full range of sedentary work, as defined in 20 [C.F.R.] 404.1567(a)."  Id.  Specifically, the ALJ found that, "in an eight-hour workday, [Torres] could sit for up to six hours and stand or

walk for up to two hours, lift/carry objects weighing a maximum of 10 pounds, and push/pull to

her lifting/carrying capacity." Id.  The ALJ explained that, while

> [t]he medical record substantiates that the claimant had functional limitations
> associated with lumbar and cervical spine impairments . . ., the evidence does not
> support a finding that any one or more of the claimant's impairments was so
> limiting that she was unable to perform sustained work from January 19, 1999
> through September 30, 2003.

Id.

The ALJ considered Torres's description of her impairments, see R. 14, but found that

her "statements concerning the intensity, persistence and limiting effects of the symptoms are not

entirely consistent with the medical evidence and other evidence in the record during the period

from January 19, 1999 through September 30, 2003," R. 16.  The ALJ described the objective

medical evidence that caused him to reach this conclusion including that Torres "had MRI

evidence of lumbar and cervical disc herniations, and she had positive clinical findings on

examination of the lower back," but found that there was "no evidence of nerve root compromise

apart from an isolated finding of weakness in March 1999, which is bookended in the medical

record by numerous findings of normal motor strength."  R. 16-17.  This evaluation included a

discussion of the opinions and records of Drs. Savage, Patil, Ku, and Leivy.  See R. 14-18.

At step four, the ALJ concluded that Torres was "unable to perform any past relevant

work," during the relevant time period because "[t]he exertional demands of the claimant's past

relevant work exceeded her residual functional capacity for work at the sedentary level of

exertion."  R. 18.

Finally, at step five, considering Torres's "age, education, work experience, and residual

functional capacity" for sedentary work, the ALJ found "there were jobs that existed in

significant numbers in the national economy that [Torres] could have performed."  R. 19.  The

ALJ determined that a "finding of 'not disabled' [was] directed by Medical Vocational Rule 201.28." Id.

## II.  GOVERNING STANDARDS OF LAW

### A.  Scope of Judicial Review Under 42 U.S.C. § 405(g)

A court reviewing a final decision by the Commissioner "is limited to determining whether the [Commissioner's] conclusions were supported by substantial evidence in the record and were based on a correct legal standard." Selian v. Astrue, 708 F.3d 409, 417 (2d Cir. 2013) (per curiam) (punctuation omitted); accord Greek v. Colvin, 802 F.3d 370, 374-75 (2d Cir. 2015) (per curiam); see generally 42 U.S.C. § 405(g) ("The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . ."). Substantial evidence is "more than a mere scintilla." Richardson v. Perales, 402 U.S. 389, 401 (1971) (punctuation omitted) (quoting Consol. Edison Co. v. N.L.R.B., 305 U.S. 197, 229 (1938)); accord Greek, 802 F.3d at 375; Burgess v. Astrue, 537 F.3d 117, 127-28 (2d Cir. 2008). "It means — and means only — such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Biestek v. Berryhill, 139 S. Ct. 1148, 1154 (2019) (punctuation omitted). The "threshold for such evidentiary sufficiency is not high." Id.

Thus, it is not a reviewing court's function "to determine de novo whether [a claimant] is disabled." Schaal v. Apfel, 134 F.3d 496, 501 (2d Cir. 1998) (punctuation omitted); accord Cage v. Comm'r of Soc. Sec., 692 F.3d 118, 122 (2d Cir. 2012), cert. denied, 570 U.S. 919 (2013). "Even where the administrative record may also adequately support contrary findings on particular issues, the ALJ's factual findings must be given conclusive effect so long as they are supported by substantial evidence." Genier v. Astrue, 606 F.3d 46, 49 (2d Cir. 2010) (per curiam) (punctuation omitted).  In other words, "[i]f the reviewing court finds substantial

evidence to support the Commissioner's final decision, that decision must be upheld, even if substantial evidence supporting the claimant's position also exists." Johnson v. Astrue, 563 F. Supp. 2d 444, 454 (S.D.N.Y. 2008) (citing Alston v. Sullivan, 904 F.2d 122, 126 (2d Cir. 1990)). The Second Circuit has held that "[t]he substantial evidence standard means once an ALJ finds facts, [a court] can reject those facts only if a reasonable factfinder would have to conclude otherwise." Brault v. Soc. Sec. Admin., Comm'r, 683 F.3d 443, 448 (2d Cir. 2012) (per curiam) (emphasis in original, punctuation omitted). "The role of the reviewing court is therefore quite limited and substantial deference is to be afforded the Commissioner's decision." Johnson, 563 F. Supp. 2d at 454 (punctuation omitted).

     B.  Standard Governing Evaluation of Disability Claims by the Agency

     The Social Security Act defines the term "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); see id. § 1382c(a)(3)(A). A person will be found to be disabled only if it is determined that his "impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

     To evaluate a Social Security claim, the Commissioner is required to examine: "(1) the objective medical facts; (2) diagnoses or medical opinions based on such facts; (3) subjective evidence of pain or disability testified to by the claimant or others; and (4) the claimant's educational background, age, and work experience." Mongeur v. Heckler, 722 F.2d 1033, 1037

(2d Cir. 1983) (per curiam); accord Brown v. Apfel, 174 F.3d 59, 62 (2d Cir. 1999) (per curiam);

Craig v. Comm'r of Soc. Sec., 218 F. Supp. 3d 249, 260 (S.D.N.Y. 2016).

Regulations issued pursuant to the Act set forth a five-step process that the Commissioner

must use in evaluating a disability claim.  See 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); see

also Burgess, 537 F.3d at 120 (describing the five-step process).  First, the Commissioner must

determine whether the claimant is currently engaged in any "substantial gainful activity."  20

C.F.R. §§ 404.1520(a)(4)(i), 416.920(a)(4)(i).  Second, if the claimant is not engaged in

substantial gainful activity, the Commissioner must decide if the claimant has a "severe

medically determinable physical or mental impairment," id. §§ 404.1520(a)(4)(ii),

416.920(a)(4)(ii), which is an impairment or combination of impairments that "significantly

limits [the claimant's] physical or mental ability to do basic work activities," id. §§ 404.1520(c),

416.920(c).  Third, if the claimant's impairment is severe and is listed in 20 C.F.R. Part 404,

Subpart P, Appendix 1, or is equivalent to one of the listed impairments, the claimant must be

found disabled regardless of his or her age, education, or work experience.  See id.

§§ 404.1520(a)(4)(iii), 404.1520(d), 416.920(a)(4)(iii), 416.920(d).  Fourth, if the claimant's

impairment is not listed and is not equal to one of the listed impairments, the Commissioner must

review the claimant's RFC to determine if the claimant is able to do work he or she has done in

the past, i.e., "past relevant work."  Id. §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv).  If the claimant

is able to do such work, he or she is not disabled.  Id. §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv).

Finally, if the claimant is unable to perform past relevant work, the Commissioner must decide if

the claimant's RFC, in addition to his or her age, education, and work experience, permits the

claimant to do other work.  Id. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v).  If the claimant cannot

perform other work, he or she will be deemed disabled.  Id. §§ 404.1520(a)(4)(v),

416.920(a)(4)(v).  The claimant bears the burden of proof on all steps except the final one — that

is, proving that there is other work the claimant can perform.  See Poupore v. Astrue, 566 F.3d

303, 306 (2d Cir. 2009) (per curiam).

III.  DISCUSSION

Torres raises two issues in her brief: (1) that the ALJ did not properly weigh the opinions

of her treating physicians and (2) that the ALJ erred at step five in determining that there was

other work she could perform.  Pl. Mem. at *25-36.  We discuss these issues next and then

address separately arguments made by Torres regarding the ALJ's questioning of Dr. Savage, see

id. at *33-36.

A.  Weight Given to Torres's Treating Physicians

The record includes reports from numerous physicians who treated Torres before, during

and after the relevant time period.  Four of these physicians are referred to as "treating

physicians" in the parties' submissions.  These are Drs. Patil, Ku, Elfiky and Tenedios-

Karanikolas.  Because neither party raises the issue of whether these physicians are properly

considered treating physicians, we accept them as such.  We will not address Dr. Elfiky further,

however, because Dr. Elfiky treated Torres after the relevant period and there is no argument or

evidence Dr. Elfiky gave a retrospective opinion, see R. 787-795.

In determining Torres's RFC, the ALJ gave "significant weight" to Dr. Savage's opinion,

"substantial weight" to Dr. Leivy's opinion, and "limited weight to the various opinions in the

record rating the claimant as temporarily disabled, permanently disabled, or 75% disabled, under

Workers' Compensation guidelines."  R. 18.  This includes the opinions of Drs. Patil, Ku and

Elfiky.  The ALJ gave no weight to Dr. Tenedios-Karanikolas's "2009 and 2017 opinions,"

because they post-date the period at issue and therefore had "no bearing on [Torres's] claim."  Id.

Under the so-called "treating physician" rule, the ALJ must generally give "more weight to medical opinions" from a claimant's "treating sources" — as defined in the regulations — when determining if the claimant is disabled.  See 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2).[3]  Treating sources, which includes some professionals other than physicians, see 20 C.F.R. §§ 404.1527(a)(2), 416.927(a)(2), "may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations."  20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2).  The Second Circuit has summarized the deference that must be accorded the opinion of a "treating source" as follows:

> Social Security Administration regulations, as well as our precedent, mandate specific procedures that an ALJ must follow in determining the appropriate weight to assign a treating physician's opinion.  First, the ALJ must decide whether the opinion is entitled to controlling weight.  "[T]he opinion of a claimant's treating physician as to the nature and severity of [an] impairment is given 'controlling weight' so long as it 'is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record.'"  Burgess, 537 F.3d at 128 (third brackets in original) (quoting 20 C.F.R. § 404.1527(c)(2)).  Second, if the ALJ decides the opinion is not entitled to controlling weight, it must determine how much weight, if any, to give it.  In doing so, it must "explicitly consider" the following, nonexclusive "Burgess factors": "(1) the frequen[cy], length, nature, and extent of treatment; (2) the amount of medical evidence supporting the opinion; (3) the consistency of the opinion with the remaining medical evidence; and (4) whether the physician is a specialist.  Selian[, 708 F.3d at 418] (citing Burgess, 537 F.3d at 129 (citing 20 C.F.R. § 404.1527(c)(2))).  At both steps, the ALJ must "give good reasons in [its] notice of determination or decision for the weight [it gives the] treating source's [medical] opinion.  Halloran v. Barnhart, 362 F.3d 28, 32 (2d Cir. 2004) (per curiam) (quoting 20 C.F.R. § 404.1527(c)(2)). . . .  An ALJ's failure to "explicitly" apply the Burgess factors

---

[3]  Although the SSA has since revised its regulations to eliminate the treating physician rule, the rule applies in this case because it was filed before March 27, 2017.  See, e.g., Conetta v. Berryhill, 365 F. Supp. 3d 383, 394 n.5 (S.D.N.Y. 2019).

when assigning weight at step two is a procedural error.  Selian, 708 F.3d at 419-
20.

Estrella v. Berryhill, 925 F.3d 90, 95-96 (2d Cir. 2019).  Accordingly, the Second Circuit has

stated that it will "not hesitate to remand when the Commissioner has not provided 'good

reasons' for the weight given to a treating physician[']s opinion and [it] will continue remanding

when [it] encounter[s] opinions from ALJ[s] that do not comprehensively set forth reasons for

the weight assigned to a treating physician's opinion."  Halloran, 362 F.3d at 33; accord Estrella,

925 F.3d at 96; see also Greek, 802 F.3d at 375-77.

     Nonetheless, the Commissioner is not required to give deference to a treating physician's

opinion where "the treating physician issued opinions that are not consistent with other

substantial evidence in the record, such as the opinions of other medical experts."  Halloran, 362

F.3d at 32 (citation omitted).  In fact, "the less consistent [a treating physician's] opinion is with

the record as a whole, the less weight it will be given."  Snell v. Apfel, 177 F.3d 128, 133 (2d

Cir. 1999) (citing 20 C.F.R. § 404.1527(d)(4)); see also Veino v. Barnhart, 312 F.3d 578, 588

(2d Cir. 2002) ("Genuine conflicts in the medical evidence are for the Commissioner to

resolve.") (citation omitted).  Finally, a "slavish recitation of each and every factor [listed in 20

C.F.R. § 404.1527(c)]" is unnecessary "where the ALJ's reasoning and adherence to the

regulation are clear," Atwater v. Astrue, 512 F. App'x 67, 70 (2d Cir. 2013) (summary order)

(citing Halloran, 362 F.3d at 31-32), and even where the ALJ fails to explicitly apply the

"Burgess factors," a court may, after undertaking a "'searching review of the record,'" elect to

affirm the decision if "'the substance of the treating physician rule was not traversed.'"  Estrella,

925 F.3d at 96 (quoting Halloran, 362 F.3d at 32).

     1.  Dr. Tenedios-Karanikolas

     Dr. Tenedios-Karanikolas is a rheumatologist treating Torres for fibromyalgia as well as

chronic pain and fatigue.  See R. 587, 592.  Dr. Tenedios-Karanikolas is the only treating

physician to complete a detailed medical assessment form.  See R. 574-592, 594-600.  However, Dr. Tenedios-Karanikolas did not begin treating Torres until after her date last insured. Additionally, there is no evidence in the record supporting a finding that Torres had fibromyalgia during the relevant period.[4]  While Torres provides a detailed summary of Dr. Tenedios-Karanikolas's assessment of her functionality, see Pl. Mem. at *30-31, she acknowledges that "[t]he ALJ specifically rejected Dr. Tenedios Karaniholas [sic] opinion because she did not began [sic] treating Plaintiff until after the date last insured," id. at *31.  Indeed, the ALJ rejected Dr. Tenedios-Karanikolas's opinion because she "did not evaluate or treat [Torres] until years after the date last insured, and her assessment [was] not based on any contemporaneous evidence during the period at issue."  R. 18.  Torres makes no argument this was an error, apparently not challenging the ALJ's rejection of Dr. Tenedios-Karanikolas's opinion.  Given her failure to raise any argument that the ALJ erred in rejecting Dr. Tenedios-Karanikolas's opinion, or that Torres had a diagnosis of fibromyalgia during the relevant period, the ALJ did not err in rejecting Dr. Tenedios-Karanikolas's opinion.

### 2. Drs. Patil, and Ku

Turning next to the opinions of Drs. Patil and Ku, Torres claims that "the ALJ does not indicate what weight, if any he afforded to Drs. Patil, [and] Ku['s] . . . opinions," aside from a "general dismissal," Pl. Mem. at *31, of the "various opinions in the record rating the claimant as temporarily disabled, permanently disabled, or 75% disabled, under Workers' Compensation

---

[4]  We note that Dr. Tenedios-Karanikolas's medical assessment form indicates that treatment began in 2003.  See R. 574.  Depending on what date treatment began in 2003, Dr. Tenedios-Karanikolas's treatment of Torres could fall within the relevant time period.  This issue was raised during the hearing before the ALJ, see R. 55, and, while not resolved, neither party claims Dr. Tenedios-Karanikolas began treating Torres within the relevant time period in their summary of the medical evidence, see Pl. Mem. at *14; Def. Mem. at 9.

guidelines," id. (punctuation omitted) (quoting R. 18).  Indeed, the ALJ stated that the "limited

weight" he gave the opinions of Drs. Patil and Ku related only to their rating of Torres's

disability and not to any other opinions.  R. 18.

The Commissioner argues that Torres's position "that the ALJ did not adequately explain

why he gave little weight to the opinions of Drs. Patil, [and] Ku . . . [is] . . . meritless," Def.

Mem. at 15, because "Drs. Patil, [and] Ku . . . only opined that [Torres] was disabled to varying

degrees," id. at 17.  Torres responds that she is not challenging the ALJ's rejection of the

doctors' opinions regarding the extent of Torres's disability, see Pl. Opp. at *2-3, but is instead

challenging the ALJ's rejection of  "diagnoses of lumbar radiculopathy, symptoms including

abnormal, antalgic gait, bilateral root weakness, neurological deficit, decreased reflexes, severe,

obvious, pain, that Plaintiff should avoid bending or lifting, has failed conservative treatment,

and has a 'guarded' prognosis," Pl. Opp. at *4 (internal citations omitted).[5]  Torres otherwise

acknowledges that "[t]he ultimate issue of whether a claimant is disabled is reserved for the

Commissioner," and does not argue "that an opinion that a claimant meets the standards of

disability under laws regulating worker's compensation claims is controlling with respect to a

claim of disability."  Id. at *2.

The ALJ does not specifically state what weight he afforded Drs. Patil and Ku's opinions

on the various matters raised but the ALJ's opinion reflects that the ALJ accepted the various

diagnoses and findings at the time they were made.  Indeed, the ALJ discussed these doctors'

findings in depth, including the findings that plaintiff points to.  See R. 15-16.[6]  For example, the

---

[5]  We note that some of the citations given do not reflect diagnoses or findings made by
Drs. Patil and Ku, such as findings of neurological deficit, R. 323, and the claim that plaintiff
should avoid bending or lifting, R. 301.

[6]  While the ALJ's decision attributes the "[c]linical records" which he reviews entirely to
Dr. Patil, we note that the ALJ cited records signed by Dr. Ku as well.  See R. 15-16.

ALJ pointed to Dr. Patil's report that Torres "continued to report low back radiating to both lower extremities and numbness in both legs" despite engaging in physical therapy, that "Dr. Patil's progress notes through April 2000 indicate that [Torres] consistently presented with an antalgic gait and had findings of reduced range of motion, muscle spasms, and positive straight leg raising (at varying degrees), but with normal reflexes (except for trace right knee jerk and absent ankle jerks) and generally normal motor examination."  R. 15.  The ALJ also acknowledged there were "two documented instances of findings of motor weakness in the medical record," noting that "only one . . . occurred during the period at issue."  Id.  The ALJ observed that a subsequent examination by a non-treating physician, Dr. Leivy, later that month "did not show signs of motor weakness or atrophy."  Id.  Additionally, at Torres's "next visit to Dr. Patil . . ., she had normal motor examination findings, showed no sign of weakness or atrophy, and had normal sensory examination."  R. 16.

Neither doctor offered any opinion as to Torres's functional abilities, and the ALJ's decision otherwise contained a thorough review of the findings encompassed in Drs. Patil and Ku's reports and progress notes.  While Torres argues "[i]t was especially crucial for the ALJ to address these assessments and explain what weight they were given, because they contradict the medical opinion the ALJ relied in [sic] forming his RFC," Pl. Opp. at *4, we disagree because the ALJ's opinion reflects that he accepted the findings and diagnoses.  The ALJ marshalled all the evidence, including the findings pointed to by Torres, to make a determination regarding her RFC — a topic on which no treating physician for the relevant period gave an opinion.

Additionally, as previously explained, there was a single instance of motor weakness noted by Dr. Ku during the relevant period,[7] and the ALJ explained that this finding was "bookended in the medical record by numerous findings of normal motor strength," R. 16-17. The ALJ thus did not refuse to accord full weight to the opinions of these treating physicians.[8] Neither physician offered an opinion relating to functioning at all, let alone one inconsistent with the ALJ's decision, and the decision contained a thorough review of Drs. Patil and Ku's progress reports and notes.  For example, the ALJ found that Dr. Patil's "February 1999 progress note" aligned with Dr. Leivy's findings including that Torres "could perform work that did not require prolonged standing or heavy lifting."  R. 16.

  Accordingly, the ALJ did not violate the treating physician rule.

3.  <u>Dr. Leivy</u>

Torres also takes issue with ALJ's reliance on the opinion of Dr. Leivy.  <u>See</u> Pl. Mem. at *32-33.  Dr. Leivy examined Torres once in 1999 in connection with her worker's compensation claim.  <u>See</u> R. 293-297.  The ALJ gave Dr. Leivy's opinion "substantial weight as it [was] supported by the examination findings, which Dr. Leivy explained in his report, and [was] consistent with the conservative course of treatment and the claimant's self-described activities in 1999."  R. 18.  Torres argues the ALJ "failed to provide good reasons for crediting the opinion of a one time examining physician evaluating Plaintiff's impairment through the lens of the

---

[7]  While the ALJ states this finding "appears in Dr. Patil's March 2, 1999 progress note," R. 16, this is clearly an error as he cited to Dr. Ku's March 2, 1999 progress note, <u>see</u> <u>id.</u>  <u>See</u> R. 281.

[8]  Torres also points to medical opinions in the record finding a "neurological deficit," and recommending that Torres "should avoid bending or lifting."  Pl Opp. at *4.  Neither opinion was given by any of the doctors Torres alleges to be a treating physician.  <u>See</u> R. 301, 323. Accordingly, they are inapplicable to our inquiry.

Worker's Compensation rules but failing to credit the opinions of three treating doctor's opinion's [sic] under the same rules."  Pl. Mem. at *33.  Torres claims the ALJ relied on Dr. Leivy's opinion only after "rejecting the opinions of claimant's treating doctors."  Id. at *32.

Torres's argument rests on an inaccurate characterization of the ALJ's opinion.  The ALJ did not reject opinions of Torres's treating physicians from the relevant period as to any limitations in functioning, as already noted.  Indeed, the ALJ discussed the only finding that arguably conflicted with Dr. Leivy's, the isolated incident of motor weakness, and explained that subsequent reports and progress notes had found no motor weakness.  See R. 16-17.  The ALJ also gave sufficient explanation for the weight afforded Dr. Levy's opinion.  Dr. Leivy was the only physician to give an opinion as to Torres's functional work capacity during the relevant time period, see R. 266-321, and the ALJ explained that Dr. Leivy's opinion was supported by his "examination findings" as well as "the conservative course of treatment and the claimant's self-described activities in 1999," R. 18.  "An ALJ may decide to accord more weight to the opinions of non-treating physicians if their opinions are consistent with the record."  Distefano v. Berryhill, 363 F. Supp. 3d 453, 474 (S.D.N.Y. 2019).  Accordingly, the ALJ did not err in giving substantial weight to Dr. Leivy's opinion.

### 4. Medical Expert Dr. Savage

Torres also objects to the weight the ALJ placed on Dr. Savage's "opinion regarding Plaintiff's ability to perform sedentary work."  Pl. Mem. at *36.  Specifically, Torres argues Dr. Savage "admitted to applying vastly more restrictive findings than those outlined in the Regulation's [sic] of sedentary work."  Id. at *35.  Torres contends that "ME Savage testified that, in order to find a claimant unable to perform even sedentary work, he must find a claimant

either has an inability to bare [sic] weight or demonstrates absolutely no motor response or sensory response because of gross motor injury." Id. (punctuation omitted).

A review of the hearing record does not support Torres's characterization of Dr. Savage's testimony. When Torres's attorney asked Dr. Savage if he based his opinion that Torres could perform sedentary work "on the activities that an average person with lumbar radiculopathy could perform," R. 88, Dr. Savage testified that he looks to see if there are "any one or two or three areas that was rendered impossible to even consider it," R. 89. Dr. Savage explained these areas are the "[i]nability to bear weight," and "where a person that had clear height pathology in the radicular areas, where there's absolutely no sensory response, or no motor response." Id. In attempting to clarify this testimony, and in garbled language, Dr. Savage explained that he "was referring to for people who are just trade out of not even making sedentary, would be for the people who had zero sensory function, or motor function, or both, over a significant period of time." R. 98. While hardly clear, we believe the Commissioner to be correct that Dr. Savage was "describ[ing] the extreme impairments he had observed in those claimants who did not even make sedentary." Def. Mem. at 20 (punctuation omitted). In other words, Dr. Savage did not testify that he must find one of these three things in order to find a claimant cannot perform sedentary work but rather that, if one of these three things is present, the claimant cannot perform sedentary work.

Supporting this interpretation of Dr. Savage's testimony, Torres's attorney asked Dr. Savage whether there were "any rulings by the commissioner, or any language in the listings that require" the findings Dr. Savage indicated he looks for "to find that somebody is unable to perform sedentary work, because of their back impairments." R. 90. Dr. Savage responded that

he "rel[ies] on 1.04a." Id. We therefore reject Torres's argument that Dr. Savage testified that he applies more stringent standards than those required by the regulations.

In sum, the ALJ did not err in his treatment of the opinions of the treating physicians. [9]

B. Non-Exertional Limitations

Torres argues that the ALJ erred at step five by relying on Medical-Vocational Rule 201.28 instead of calling on a vocational expert. Pl. Mem. at *26. Torres claims that reliance on the guidelines "was improper, . . . because the ALJ ignored evidence that [Torres] suffered from nonexertional limitations." Id.[10]

Torres primarily argues that, because she "suffers from non-exertional limitations not contemplated by the grids, the ALJ was required at step five to call upon a vocational expert to establish whether [she] was disabled." Pl. Mem. at *26; see also Pl. Opp. at *5.

"A 'non-exertional limitation' is a limitation or restriction imposed by impairments and related symptoms that affect only the claimant's ability to meet the demands of jobs other than the strength demands." Reyes v. Colvin, 2015 WL 337483, at *15 n. 22 (S.D.N.Y. Jan. 26, 2015) (citing 20 C.F.R. §§ 404.1569a(c), 416.969a(c)). Examples of non-exertional limitations include "difficulty performing the manipulative or postural functions of some work such as

---

[9]  Torres cites a number of opinions explaining that it is error to reject a treating physician's opinion regarding a claimant's functional assessment based primarily on the fact the functional assessment was given in the context of a worker's compensation claim. See Pl. Opp. at *3-4. As explained above, the only treating physician to give a functional assessment is Dr. Tenedios-Karanikolas and the ALJ properly gave no weight to her opinion on other grounds. These cases are therefore irrelevant.

[10]  Plaintiff also asserts that reliance on the grids was improper because "the ALJ erred in concluding that [Torres] retained the residual functional capacity to meet the exertional demands of sedentary work." Pl. Mem. at *26. But apart from her arguments about the application of the treating physician rule, Torres makes no arguments attacking the RFC finding, see Pl. Mem. at *26-28; Pl. Opp. at *5-8, and thus we do not consider this issue further.

reaching, handling, stooping, climbing, crawling, or crouching," 20 C.F.R.

§ 404.1569a(c)(1)(vi), among other things, see id. § 404.1569a(c)(1)(i)-(v).

>The Second Circuit has instructed that:

>>If a claimant has nonexertional limitations that "significantly limit the range of work permitted by his exertional limitations," the ALJ is required to consult with a vocational expert. Bapp v. Bowen, 802 F.2d 601, 605 (2d Cir. 1986) (internal quotation marks omitted) (quoting Blacknall v. Heckler, 721 F.2d 1179, 1181 (9th Cir. 1983)). However, the "mere existence of a nonexertional impairment does not automatically . . . preclude reliance on the guidelines." Id. at 603. A nonexertional impairment "significantly limit[s]" a claimant's range of work when it causes an "additional loss of work capacity beyond a negligible one or, in other words, one that so narrows a claimant's possible range of work as to deprive him of a meaningful employment opportunity." Id. at 605–06.

Zabala v. Astrue, 595 F.3d 402, 410–11 (2d Cir. 2010).

>Here, the ALJ found that, "considering the claimant's age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that the claimant could have performed." R. 19. The ALJ implicitly found Torres did not have any non-exertional limitations in her RFC and did not call on a vocational expert to determine whether Torres was disabled during the relevant period.

>Torres claims that her non-exertional limitations include "disabling pain and manipulative and postural limitations such as a severe restriction on reaching, handling and fingering," and argues these non-exertional limitations are "supported by MRIs, EMG studies, clinical findings of positive straight leg raising, decreased range of motion, decreased sensation and and [sic] motor strength and treatment records documenting the need for epidural injections, physical therapy and lumbar spine surgery." Pl. Mem. at * 27. In making this argument, however, Torres not only fails to cite to any page of the medical record, but also fails to connect how any records support her argument that she had non-exertional limitations during the relevant

time period.  She does not link a single test or result to any alleged non-exertional limitations.
For this reason alone, we reject this argument.

In any event, the record does not support Torres's contention that she had non-exertional
limitations during the relevant period.  As discussed above, the ALJ found there to be only one
instance of motor weakness in the record, which was "bookended . . . by numerous findings of
normal motor strength."  R. 16-17.  An ALJ is not required to include a non-exertional limitation
in the RFC where it is "not supported by the medical record."  Jackson v. Comm'r of Soc. Sec.,
2019 WL 4926434, at *4 (W.D.N.Y. Oct. 7, 2019) (in turn citing McIntyre v. Colvin, 758 F.3d
146, 150 (2d Cir. 2014) for the proposition that "although the ALJ's step four RFC finding did
not explicitly include the plaintiff's non-exertional functional limitations, 'Step Four findings
need only afford an adequate basis for meaningful judicial review, apply the proper legal
standards, and be supported by substantial evidence such that additional analysis would be
unnecessary or superfluous'") (citation omitted).

Thus, we find no error in the ALJ's use of the guidelines to determine Torres was not
disabled.[11]

C.  ALJ's Examination of Dr. Savage

Torres takes issue with the ALJ's conduct during the hearing as well as his
characterization of Dr. Savage's testimony in his decision.  See Pl. Mem. at *33-35.  While not

---

[11]   Torres also argues the ALJ "failed to perform a function by function analysis
addressing [Torres's] nonexertional limitations."  Pl. Opp. at *8.  Torres raised this argument for
the first time in her reply brief.  For this reason alone, we reject this argument.  See Jaquez v.
Comm'r of Soc. Sec., 2020 WL 7028976, at *6 (S.D.N.Y. Nov. 30, 2020) ("The Court declines
to consider [plaintiff's] argument made for the first time in reply.") (citing Knipe v. Skinner, 999
F.2d 708, 711 (2d Cir. 1993)).  In any event, because we find Torres failed to establish the ALJ
erred in finding that she had no non-exertional limitations during the relevant period, this
argument fails.

explicitly framed as such, we believe Torres to be arguing she was not afforded a fair hearing or decision and that the ALJ was biased.

"[D]ue process requires that ALJs be impartial and unbiased during administrative proceedings." Pabon v. Comm'r of Soc. Sec., 2015 WL 4620047, at *5 (S.D.N.Y. Aug. 3, 2015) (citing Schweiker v. McClure, 456 U.S. 188, 195–96 (1982)), adopted by, 2015 WL 5319265 (S.D.N.Y. Sept. 11, 2015).  However, "ALJs . . . are presumed to be unbiased," id., as well as "to exercise their decision-making authority with honesty and integrity," id. (citing Withrow v. Larkin, 421 U.S. 35, 47 (1975)).  "The plaintiff bears the burden of rebutting that presumption by pointing to a conflict of interest, extreme behavior demonstrating a clear inability to render a fair decision, or some other specific reason for disqualification." McDonagh v. Acting Comm'r of Soc. Sec., 2017 WL 9286987, at *16 (S.D.N.Y. Nov. 27, 2017) (citing Schweiker, 456 U.S. at 195-96 and Card v. Astrue, 752 F. Supp. 2d 190, 191 (D. Conn. 2010)), adopted by, 2018 WL 2089340 (S.D.N.Y. May 2, 2018).  "Such impermissible conduct must be clear from the record and cannot be based on speculation or inference." Pabon, 2015 WL 4620047, at *5 (punctuation omitted).

Turning first to the hearing, Torres points to the ALJ's conduct during the "direct and cross examination" of Dr. Savage arguing it "gives rise to serious concerns about the fundamental fairness of the disability review process." Pl. Mem. at *33.  Torres argues the ALJ "recit[ed] choice passages from the medical record," that he "pose[d] unabashedly leading questions to the ME," and that "during [Torres's] counsel's cross examination, the Judge repeatedly answer[ed] questions posed to the ME before the ME is able to respond then secure[d] agreement by the ME, interrupt[ed] the ME's testimony to correct his answer and restate[d] and

reform[ed] the ME testimony to support the ALJ's clear preconceived decision the claimant is not disabled." Id. at *33-34.

We find nothing improper in the ALJ's recitation of the medical record at the beginning of his direct examination of Dr. Savage.  The ALJ acknowledged evidence that Torres's "gait was slow and antalgic" and that her "straight leg raise [was] possible up to — that's a positive straight leg — 15 degrees."  R. 70.  Indeed, the ALJ then asked Dr. Savage whether this positive straight leg raise "would indicate that [Torres was] having some back problems," to which Dr. Savage responded it would.  Id.  He also observed there was a finding that Torres had "weakness in the left leg."  Id.  The ALJ goes on to ask clarifying questions about the record, including what it meant that Torres's "right knee jerk was trace, and both the ankle jerks were absent," R. 71.  The ALJ was therefore not unduly selective in his choice of passages from the medical record, see Pl. Mem. at *33, but rather appeared to be asking Dr. Savage questions as to the meaning of certain passages.

Torres also asserts that the ALJ asked leadings questions and behaved improperly during counsel's cross-examination of Dr. Savage.  See Pl. Mem. at *33-34.  While the ALJ did ask some leading questions, see R. 72-74, "asking leading questions alone does not demonstrate bias or a prejudicial tone," McDonagh, 2017 WL 9286987, at *16; accord Castaldo v. Astrue, 2012 WL 2847904, at *7 (W.D.N.Y. July 11, 2012) ("the mere fact that the ALJ asked leading questions is insufficient" to establish bias).

We also reject Torres's characterization of the ALJ's conduct during Torres's counsel's cross-examination of Dr. Savage.  Torres argues the ALJ "repeatedly answer[ed] questions posed to the ME before the ME [was] able to respond then secure[d] agreement by the ME, interrupt[ed] the ME's testimony to correct his answer and restate[d] and reform[ed] the ME

testimony to support the ALJ's clear preconceived decision the claimant [was] not disabled."  Pl.

Mem. at *34.  While the ALJ did interrupt counsel's cross-examination of Dr. Savage, he

typically did so in order to clarify counsel's question.  For example, in the first instance Torres

cites, <u>see</u> <u>id.</u>, the ALJ interrupted in order to clarify the time period Torres's counsel was

referring to:

> ME: I — you mean — are you referring, counsel, back to 2003 or —
>
> ATTY: Yes, I —
>
> [ALJ:] Yeah, no, no, no, she's referring back to 2002, 1999, 2000, 2001, 2002, 2003, that area.
>
> [ME:] Okay.  Okay.  Thank you, that clarifies it. . . .

R. 75.  The ALJ also then sought clarity as to Dr. Savage's testimony and whether he was

testifying that "there's nothing . . . that would rule out sedentary work," or whether "there

[was] something there that shows [Torres] could do sedentary work."  R. 76; <u>see</u> <u>also</u>

R. 86.

Even where the ALJ interrupted Torres's counsel to seemingly cut off cross-

examination, he allowed counsel to expand on what she had been trying to ask and point

to evidence in the record:

> ALJ: Okay, counsel, I don't think — I think he's right.  But if I'm wrong — if we're wrong, fine.  But I think there's no — that at least around that period, it was full strength.
>
> ATTY: There was not.  If I point to you for exhibit —
>
> ALJ: Okay, where — counsel, where were you looking?
>
> ATTY: Two exhibits, 3F page five and 3F page 16.
>
> ALJ: Okay, so let's look.  Counsellor, let's look.  Page five, okay.  Okay.  Okay, okay.  An MRI.  I don't see it.  Mantle's pain area is normal.

ATTY: So that's straight leg raising —

ALJ: Range of motion.  Motor testing was significantly — okay, restricted bilateral as to the right [INAUDIBLE] — okay.  So level four, level five.  Okay.

. . .

ALJ: So that's — so you go a year later, almost exactly a year later, a little more than a year later, and there's no motor weakness.  At least on examination.  So, I mean, so is it she met — how do I know six months afterwards?

ATTY: But in the record — the record satisfies all of the elements of 1.4 — 1.04.

ALJ: For a year, counsel?

ATTY: Well, even within the year, there are some dates where her clinical findings are different.  So there is — on some of the exams during this period, she does have motor loss.  And some she doesn't.

ALJ: And others they don't.  Okay.

R. 79-80.  The ALJ was therefore asking counsel to point him to evidence in the record that supports a finding that Torres was disabled for a year-long period, as is required for the ALJ to find Torres was disabled during the relevant time period.  Torres's counsel ended the cross-examination by stating she had "[n]o further questions."  R. 98.  As a result, we find that the presumption of fairness has not been overcome.  See, e.g., Maldonado v. Berryhill, 2017 WL 946329, at *30 (S.D.N.Y. Mar. 10, 2017) (finding "remand [was] not warranted due to the ALJ's bias" where the ALJ only interrupted testimony in order "to further — not disrupt — the fact finding process," then allowed counsel to continue her cross-examination and "counsel never objected to the interruptions"); Pabon, 2015 WL 4620047, at *7 (plaintiff failed to "overcome the presumption th[e] ALJ . . . was unbiased and fair" where the "ALJ fully permitted [plaintiff's] counsel to question [plaintiff] and cross-examine the vocational expert without any interruptions intended to limit such testimony").

Finally, Torres objects to the ALJ's treatment of Dr. Savage's testimony in his decision. Specifically, Torres argues "the ALJ manufactures testimony and attributes it to Dr. Savage." Pl. Mem. at *34.  Torres alleges that the "ALJ assert[ed]: Dr. Savage testified: 'there is no evidence documenting a consistent pattern of abnormal motor and strength deficits along with positive straight raising, before or after the surgery.[']" Id. (quoting R. 15).  This is an inaccurate characterization of the ALJ's decision.  While this sentence appears in the same paragraph in which the ALJ is discussing Dr. Savage's testimony, the ALJ never claims Dr. Savage gave this exact testimony.  See R. 15.

Torres also takes issue with the ALJ's statement that "'Dr. Savage noted that there is no clinical evidence of nerve root compromise, as evidenced by motor weakness, or other clinical or diagnostic indicia that would have required bedrest during the day or precluded the claimant from performing sedentary work.'" Pl. Mem. at *34 (quoting R. 15).  Torres admits that Dr. Savage agreed with the ALJ "that the plaintiff can perform sedentary work," but claims that Dr. Savage "does not once testify that there is no clinical evidence of nerve root compromise, as evidenced by motor weakness, or other clinical diagnostic indicia." Id. at *34-35 (emphasis and punctuation omitted).  Torres also points out that Dr. Savage "was not asked about, nor did he offer any opinion about whether or not Plaintiff required bedrest during the day." Id. at *35. The Commissioner argues that the ALJ gives "a fair summary of Dr. Savage's testimony." Def. Mem. at 18.  We agree.  Citing a particular page of the medical record, Dr. Savage explained that although there was a "consistent pattern of both the motor, sensory, and deep tendon reflexes being abnormal, along with the straight leg raising on a consistent basis, . . . there [was not] the degree of harm to the nerve group that otherwise would be noted." R. 84.  Additionally, while Dr. Savage did not offer an opinion as to whether Torres required bedrest during the day, he

testified multiple times that there was nothing in the record preventing Torres from performing a sedentary job.  <u>See</u> R. 69, 72, 75-77, 86.  Dr. Savage could hardly have formed this opinion having also believed Torres needed bedrest during the day.  The phrasing used by the ALJ does not necessarily suggest that Dr. Savage gave specific testimony about bedrest.

Accordingly, we find no error in the ALJ's conduct during the hearing, or his characterization of Dr. Savage's testimony in his decision.

IV.  <u>CONCLUSION</u>

For the foregoing reasons Torres's motion for judgment on the pleadings (Docket # 17), is denied, and the Commissioner's cross-motion for judgment on the pleadings (Docket # 18), is granted.


Dated:  September 14, 2021
        New York, New York


_____
GABRIEL W. GORENSTEIN
United States Magistrate Judge

26